**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**DEBRA A. HUTCHINSON**

      **Plaintiff,**

**vs.**                             **CASE NO. 1:08CV119-MP/AK**

**MICHAEL J. ASTRUE,
Commissioner of Social Security**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act (Act) for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II.

Upon review of the record, the Court concludes that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## A.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on September 26, 2002, alleging a disability onset date of September 20, 2002 because of fibromyalgia, bladder incontinence, and arthritis. (R. 61, 63-66, 70). Plaintiff petitioned for a hearing before an administrative law judge (ALJ), who conducted a hearing on May 16, 2006, and

entered an unfavorable decision on August 24, 2006. (R. 15-21). The Appeals Council denied Plaintiff's request for review on March 26, 2008, thus making the decision of the ALJ the final decision of the Commissioner. This action followed.

## B.    <u>FINDINGS OF THE ALJ</u>

The ALJ found that the Plaintiff had severe impairments of fibromyalgia and stress incontinence, but that this did not meet the listings. (R. 17-19). Despite these impairments, Plaintiff has the residual functional capacity to perform medium work with the ability to lift and carry 50 pounds occasionally and 25 pounds frequently, sit for six hours per day, stand for six hours per day, and complete a workday with normal breaks. (R. 19-20). In making this finding, the ALJ considered the nature and extent of Plaintiff's symptoms that were reasonably consistent with objective medical evidence and opinion evidence. (R. 20).

There were two types of limitations to which Plaintiff testified, the first being her physical limitations caused by fibromyalgia, arthritis, and urinary incontinence, and the second being her anxiety and depression. In addition, the ALJ found that, based upon the testimony of a vocational expert, Plaintiff is capable of performing past relevant work as a pharmacy technician and health care facility administrator because neither of these jobs is precluded by Plaintiff's residual functional capacity of medium work with some limitations. (R. 21). Therefore, Plaintiff is not disabled and can find work performing her past relevant work.

**No. 1:08CV119-MP/AK**

C.    **ISSUES PRESENTED**

    Plaintiff argues that: (1) the ALJ erred by failing to consider Plaintiff's impairments in combination at Step Two of the sequential disability analysis; (2) the ALJ erred by incorrectly assessing Plaintiff's residual functional capacity and ability to perform substantial gainful employment, failing to properly account for a treating physician's opinion; and (3) the ALJ erred by failing to include all of Plaintiff's limitations in the hypotheticals posed to the vocational expert. (Plaintiff's Br. at 5, 7, 9,11-12).

    The government responds by arguing that the ALJ considered the combined effects of Plaintiff's impairments, thus satisfying Step Two of the sequential disability analysis. (Defendant's Br. at 6). Moreover, the ALJ's residual functional capacity finding that Plaintiff was able to perform medium work with some limitations, enabling her to perform her past relevant work, is supported by substantial evidence in the record. The ALJ properly took all relevant evidence into account, including evidence of Plaintiff's activity and missionary work in the Dominican Republic. Additionally, the government argues that the ALJ's hypothetical questioning properly included all of the Plaintiff's limitations as the ALJ found them to be based upon the record. (Defendant's Br. at 10). The ALJ properly found that the Plaintiff was able to perform medium work with the limitations of lifting and carrying 50 pounds occasionally and 25 pounds frequently, sitting for six hours per day, standing for six hours per day, and completing a workday with normal breaks. These are the same limitations posed by the ALJ to the vocational expert in the initial hypothetical. (R. 387-388).

**No. 1:08CV119-MP/AK**

The issue thus presented is whether the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and decided by proper legal standards.

**D.    STANDARD OF REVIEW**

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court.  The Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).  Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam).  It is more than a scintilla, but less than a preponderance.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted).  The court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996).  It must determine only if substantial evidence supports the findings of the Commissioner.  See Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is contrary to the Commissioner's findings, where there is substantially supportive evidence of the Commissioner's findings, the court cannot overturn them.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).  Unlike the deferential review accorded to the

**No. 1:08CV119-MP/AK**

Commissioner's findings of fact, his conclusions of law are not presumed valid. <u>Martin v.</u> <u>Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  The Commissioner's failure to apply correct legal standards or to provide the reviewing court with an adequate basis for it to determine whether proper legal principles have been observed requires reversal.  <u>Id.</u> (citations omitted).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that Plaintiff is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairment?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent any other work?

**No. 1:08CV119-MP/AK**

A finding of disability or no disability at any step renders further evaluation unnecessary. Plaintiff bears the burden of establishing a severe impairment that keeps him from performing his past work. If Plaintiff establishes that his impairment keeps him from his past work, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given Plaintiff's impairments, Plaintiff can perform. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, Plaintiff must prove that he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). It is within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th Cir. 1990).

## E.    SUMMARY OF PLAINTIFF'S RELEVANT MEDICAL HISTORY

Plaintiff's chief complaints are fibromyalgia, bladder incontinence, and arthritis. Plaintiff sought treatment for her fibromyalgia and arthritis from Dr. Michael B. Rozboril from February 2000 to March 2000 and July 2002 to October 2003. (R. 307-319). Dr. Rozboril diagnosed Plaintiff with fibromyalgia, restless leg syndrome, cervical spondylosis without myelopathy (degenerative arthritis in the neck) and treated her with Flexeril and Zanaflex (muscle relaxants), Neurontin (anticonvulsant/pain medication), Effexor (antidepressant), Ultram (narcotic-like pain reliever), Darvocet (a narcotic pain reliever), Valtrex (antiviral drug), and Detrol (used to treat overactive bladder). (R. 307-

**No. 1:08CV119-MP/AK**

319). In addition, Dr. Rozboril recommended that Plaintiff treat her arthritis and fibromyalgia with massage. (R. 307). In July 2002, Dr. Rozboril remarked that Plaintiff's activity level was normal although she required some help opening jars. (R. 311).

In October 2003, Plaintiff saw a chiropractor for her neck pain, complaining of numbness and tingling throughout her entire body. (R. 320-327). After a 19-month hiatus, Plaintiff returned to the chiropractor in May 2005 complaining of continued discomfort in the neck and shoulders. (R. 328). The chiropractor noted that Plaintiff's shoulder height was unlevel, and she had misalignments at C5 and C4. The chiropractor treated Plaintiff with myofacial release, ultrasound and moist heat therapy and recommended Plaintiff start taking Vitamin B6. (R. 328).

Prior to the date of onset, Plaintiff sought treatment from Dr. Arthur Sharkey at The Hand Center in 2000 for pain in her hands that radiated to her forearms and, at times, shoulders. (R. 121). Dr. Sharkey's impression was that Plaintiff had bilateral carpal tunnel syndrome and bilateral de Quervain disease. (R. 122). Dr. Sharkey treated the de Quervain disease with a steroid injection into her wrist and treated the carpal tunnel with vitamin B and wrist splints. (R. 122). According to Plaintiff's testimony, the carpal tunnel diagnosis was a misdiagnosis and the real problem was a cancerous bone growth on her wrist that she had surgery to remove. (R. 383-384).

Plaintiff also injured her neck during a fall on the job in October 1999. Subsequent MRIs showed "multilevel degenerative changes with osteophyte complexes

**No. 1:08CV119-MP/AK**

at C3-C7 levels." (R. 152). Physical exam revealed "both visible and palpable musc[le] spasms" in Plaintiff's neck and upper body. (R. 152). She was diagnosed with possible cervical strain and prescribed Motrin and Robaxin. (R. 166). One week after the injury, Plaintiff was found to be able to return to work without restriction. (R. 169). One month later, an MRI showed disc bulges and associated bone osteophyte, but the physician was unsure why Plaintiff's pain would have begun with her on-the-job fall since there was no evidence of acute changes, but rather the disc problems appeared to result from long-standing spondylitic changes. (R. 143). "No herniated disc material, stenosis, or abnormal cord signal [was] identified." (R. 150). Later, during a March 2002 emergency room visit, a physical exam revealed no head or neck abnormalities. (R. 227-228). Additionally, in surgery prep for her July 2005 cystourethopexy to treat stress incontinence, a chest x-ray revealed "[s]ome mild degenerative changes of the thoracic spine are present." (R. 215).

Plaintiff sought treatment for her bladder incontinence from Dr. J. Derek Thompson from March 2000 to May 2000 and April 2002 to July 2002. (R. 204-219, 233, 245). She notably did not seek treatment for her incontinence between June 2000 and March 2002. Thompson diagnosed Plaintiff with minor bladder instability and primary stress incontinence in 2000. (R. 235). A 2000 sonogram revealed no kidney abnormalities. (R. 238). Upon examination, Dr. Thompson found inflammatory changes over plaintiff's bladder and chronic cystitis with "persistent urinary frequency, improved with anticholinergic therapy." (R. 245-246). In 2000, Dr. Thompson

**No. 1:08CV119-MP/AK**

prescribed Detrol, Voltaren and Levaquin, and in 2002 prescribed both Detrol and Ditropan but discontinued Detrol because while it helped Plaintiff's urinary urgency, it caused her to have blurred vision. (R. 204, 216, 233, 246). On April 30, 2002, Dr. Thompson conducted a urodynamic study on Plaintiff, finding no evidence of neurogenic bladder dysfunction. (R. 217). On June 25, 2002, Dr. Thompson performed cystourethopexy surgery to improve Plaintiff's bladder incontinence. (R. 211-12). In different examinations, Plaintiff's postvoid residual was minimal or moderately elevated. (R. 205, 219, 233).

On November 21, 2003, state agency consultant Gary Cater, D.O. completed a physical residual functional capacity assessment, indicating that while Plaintiff's allegations of fibromyalgia were credible, she retained the physical capacity to occasionally lift and/or carry up to 50 pounds, frequently lift and/or carry up to 25 pounds, stand and/or walk up to six hours with normal breaks, sit for a total of six hours with normal breaks, and push and/or pull without limitation. (R. 335). Moreover, Plaintiff had no postural, manipulative, visual, environmental nor communicative limitations. (R. 336-338).

The record is thin on any mental impairment, if any, suffered by the Plaintiff. On May 14, 2003, she sought treatment from Dr. Nicoll at Family Medical Care of Tulsa. (R. 249-250). There is an indication that either Plaintiff presented with complaints of the following or Dr. Nicoll's medical impression was the following: fibromyalgia, depression, anxiety, and urinary incontinence. (R. 249-250). In addition, Dr. Rozboril prescribed the

**No. 1:08CV119-MP/AK**

Plaintiff Effexor, an antidepressant, on a trial basis on October 16, 2003 and had

recommended Plaintiff try Prozac in March 2000, which Plaintiff declined.  (R. 307-312).

There is no evidence indicating Plaintiff was ever evaluated by a mental health

professional.

On November 20, 2003, state agency consultant David L. Kirk evaluated

Plaintiff's mental limitations and completed a psychiatric review technique form

indicating that while Plaintiff was taking Prozac and had a depression and anxiety

diagnosis, Plaintiff's file was insufficient to make a determination of her mental

disposition.  (R. 331-332)

## F.    SUMMARY OF THE ADMINISTRATIVE HEARING

Plaintiff was 51 years old at the time of the hearing and had completed two years

of college.  (R. 368-369).  She had previously worked as a nursing home coordinator,

medical center administrator, and a pharmacy technician.  (R. 370).  She suffers from

urinary incontinence, fibromyalgia, arthritis of the spine, restless leg syndrome,

depression and anxiety.  (R. 373-374).

She has burning, tingling pain that radiates from her fingertips to her spine, and

her hands and feet hurt as well.  She takes care of her personal hygiene and has her

driver's license.  (R. 369, 373-376).  In 1999, she injured her arm, neck and back in an

on-the-job fall, which ended her ability to type frequently and for which she underwent

approximately four months of physical therapy.  (R. 377-378).  In 2002, her boss gave

her a year's leave without pay because she could no longer see numbers accurately to

do her job, was urinating on herself, and was taking six or seven breaks per day. (R. 379). She currently takes Detrol to control her urinary frequency and also takes Darvocet, Tylenol, Motrin, and Ultram and wears absorbent undergarments all day. (R. 382-383, 387). The pain in her hands and arms causes her to drop things and have difficulties opening jars. (R. 384).

The initial hypothetical posed to the vocational expert included the ability to do medium work. (R. 387). The expert testified the Plaintiff would be able to perform her past relevant work, which was less demanding than medium work. (R. 387). The ALJ then added a limitation of taking four to six extra breaks per day beyond the normal three breaks per day. The vocational expert testified that this would be excessive and would preclude Plaintiff from doing any work. (R. 387-388). The expert added that in an office job, one or two excess breaks per workday would still permit the Plaintiff to perform an office job. (R. 388).

## G.    DISCUSSION

a)    Step 2 Inquiry

The Eleventh Circuit has held, as have numerous other circuits, that step two of the sequential analysis may do no more than screen out *de minimis* claims. Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987); see also Anthony v. Sullivan, 954 F.2d 289, 294-95 (5th Cir. 1992); Bailey v. Sullivan, 885 F.2d 52, 56-57 (3rd Cir. 1989). In discussing the severity requirement under the Act, the Eleventh Circuit stated that

> Step two is a threshold inquiry. It allows only claims based on the most
> trivial impairments to be rejected. The claimant's burden at step two is

**No. 1:08CV119-MP/AK**

mild. An impairment is not severe only if the abnormality is so slight
and its effect so minimal that it would clearly not be expected to
interfere with the individual's ability to work, irrespective of age,
education or work experience. Claimant need show only that her
impairment is not so slight and its effect is not so minimal.

McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

Plaintiff alleges both physical and mental impairments, which the ALJ considered
in combination to find that Plaintiff had severe impairments of fibromyalgia and stress
incontinence, but her severe impairment did not include an additional mental impairment
component. (R. 17-18). The ALJ explained that the record showed no history of mental
health treatment, counseling or hospitalizations. See Williams v. Sullivan, 960 F.2d 86,
89 (8th Cir. 1992) (absence of treatment indicates that a mental impairment is not
severe). Nothing in the record indicated that a mental impairment interfered with
Plaintiff's activities of daily living, social functioning, or ability to maintain concentration,
persistence or pace. (R. 18). The only indications of a mental health impairment are a
note of depression and anxiety accompanying a note indicating fibromyalgia in her
record from Family Medical Care of Tulsa and a trial of antidepressant Effexor in 2003,
given by her rheumatology doctor and not a mental health provider. (R. 249, 307).
Both the note of depression/anxiety and Effexor trial, moreover, are consistent with a
fibromyalgia diagnosis. Fibromyalgia is a condition that includes not only physical
symptoms such as long-term, body-wide pain and tender points in joints, muscles,
tendons, and other soft tissues, but also depression and anxiety.[1]

_____

[1] Google Health, "Fibromyalgia,"
https://health.google.com/health/ref/Fibromyalgia (last visited Feb. 5, 2010).

No. 1:08CV119-MP/AK

This discussion by the ALJ demonstrates that she considered all of Plaintiff's alleged impairments in combination, but that the scant record regarding Plaintiff's mental health precluded her from finding Plaintiff to have a combined severe impairment that included a mental impairment. In light of the record of Plaintiff's combined impairments, the ALJ found her stress incontinence and fibromyalgia to constitute a severe combined impairment. Thus, the ALJ properly considered all of Plaintiff's impairments in combination.

b)    RFC Assessment

An individual's ability to work must be assessed in light of all her impairments and any related symptoms, including pain, which is referred to as his or her residual functional capacity (RFC). 20 CFR §404.1545. A person's residual functional capacity is based on the *most* they can do despite their limitations. *Id.* In making this determination all of person's impairments are considered, even those that are not considered severe, and the entire record is to be considered, even non-medical information. *Id.* The claimant is responsible for providing this evidence. *Id.* This assessment is first used at Step Four of the evaluation process. If the ALJ determines that a claimant cannot do his past relevant work, then the same RFC will be used at Step Five in conjunction with the Guidelines to decide if the person can make an adjustment to other work in the national economy.

When there is no allegation of a physical or mental limitation, and no information in the record that there is such a limitation, it is assumed that there is no restriction with

**No. 1:08CV119-MP/AK**

respect to that functional capacity.  SSR 96-8p (Assessing Residual Functional Capacity in Initial Claims).  Medical opinions from treating sources are entitled to "special significance" and may be entitled to controlling weight if is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. If the ALJ's assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8p

In determining Plaintiff's residual functional capacity, the ALJ gave controlling weight to the Plaintiff's treating sources' medical opinions and also considered the Plaintiff's testimony and daily activities, objective clinical and laboratory evidence, and the non-treating opinions of state agency consultants that were consistent with the overall record.

The record as a whole strongly supports the ALJ's finding that while the Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms" of pain and incontinence, the Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 20).  The ALJ weighed objective medical evidence that indicated that Plaintiff's fibromyalgia and arthritis were being treated with pain medication and other therapy and her stress incontinence was being treated with medication, for which Plaintiff continued to seek refills even though she testified it did not work.  (R. 20).  Moreover, her treating physician Dr. Thompson's diagnosis was stress incontinence with *mild* bladder

instability and she traveled to the Dominican Republic in 2004 for missionary work.  (R. 18, 204, 218, 359-361).

Dr. Richard King's statement that Plaintiff's urinary incontinence "causes her a great deal of difficulty in holding a job" is not a medical opinion but rather is an opinion concerning "whether the claimant's injuries are so severe that [s]he is prevented from doing productive work," a "task assigned solely to the discretion of the Secretary." Nelson v. Sullivan, 946 F. 2d 1314, 1316 (8th Cir. 1991); see 20 C.F.R. § 404.1527(e)(1) (2009) (opinions that would direct the determination or decision of disability are reserved to the Commissioner).  Moreover, the ALJ explained that she did not give great weight to Dr. King's opinion because his conclusion was not supported by the rest of the record, including objective medical evidence and Plaintiff's own testimony and activities of daily living, including her travels to the Dominican Republic.  (R. 20).

In addition, even if Dr. King's opinion could be treated as a medical opinion per 20 C.F.R. § 404.1527(a)(2), the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis v. Callahan, 125

**No. 1:08CV119-MP/AK**

F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991), (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  The ALJ gave explicit and adequate reasons for not giving controlling weight to Dr. King's non-medical opinion by explaining that Plaintiff's work in the Dominican Republic undermined Dr. King's opinion, entitling his conclusory opinion to little weight.  (R. 20).

Plaintiff did not seek treatment for her arthritis or fibromyalgia during at least a two-year period between April 2000 and June 2002**.**  (R. 302-319).  In fact, Dr. Rozboril remarked in July 2002 that Plaintiff's activity level was normal.  (R. 311).  Plaintiff last saw Dr. Rozboril in October 2003.  That same month, Plaintiff first saw a chiropractor and received moist heat therapy.  Plaintiff did not return for nearly two years to the chiropractor and also did not seek treatment from other sources for her fibromyalgia, arthritis or pain.  (R. 320-333).  Moreover, Plaintiff performed missionary work in the Dominican Republic during 2004.  This inconsistent treatment record and showing of international travel support the ALJ's finding that Plaintiff's residual functional capacity was for medium work.

Plaintiff never sought treatment for depression or anxiety, and the note from Plaintiff's single visit to Family Medical Care of Tulsa indicating either subjective complaints of or a diagnosis of depression and anxiety does not include any treatment notes from Dr. Nicoll (R. 249-250).

The objective medical evidence and overall treating source opinions indicate that while Plaintiff suffers from pain stemming from her fibromyalgia and neck/spinal arthritis,

**No. 1:08CV119-MP/AK**

it does not interfere with her activities of daily living, and her stress urinary incontinence

is caused by a mild to moderate bladder instability but has shown improvement with

medication.  In addition, Plaintiff's performing missionary work in the Dominican

Republic in 2004 also supports a finding that her impairments do not preclude her from

medium work.  Therefore, the ALJ's residual functional assessment of medium work

with the ability to lift and carry 50 pounds occasionally and 25 pounds frequently, sit for

six hours per day, stand for six hours per day, and complete a workday with normal

breaks properly accounts for all of Plaintiff's abilities and limitations to the extent the

entire record supports them.

c)    <u>Past Relevant Work</u>

A finding that a person can perform her past relevant work ends the five-step

evaluation process at Step Four.  20 CFR § 404.1520(a)(4).  While the ALJ *may* use the

testimony of a vocational expert to supplement the claimant's own testimony about how

past relevant work was performed, he may also rely on other sources, including her own

description of that work, and is not required to call a vocational expert for Step Four

analysis.  20 CFR § 404.1560(b).

It is important to consider whether the individual can perform past relevant work

as it was actually performed "because individual jobs within an occupational category as

performed for particular employers may not entail all of the requirements of the

exertional level indicated for that category in the Dictionary of Occupational Titles and

its related volumes."  SSR96-8p (Assessing Residual Functional Capacity in Initial

**No. 1:08CV119-MP/AK**

Claims).  The next step in this evaluation is to consider whether the individual can perform their past relevant work as it is generally performed in the national economy. SSR 96-8p.

Plaintiff explained that in her past relevant work she handled contracts and administrative work.  The vocation expert testified that Plaintiff's prior work as a pharmacy technician both as Plaintiff actually performed it and as it is generally performed in the national economy was semi-skilled light work.  (R. 21).  In addition, the vocation expert testified that Plaintiff's prior work as a health care administrator both as Plaintiff actually performed it and as it is generally performed in the national economy was skilled light work.  (R. 21).

The expert testified that an individual who could perform medium work would be able to perform Plaintiff's past relevant work since both jobs were less demanding at a light physical demand level.  (R. 387).  The expert next testified that Plaintiff would be precluded from her past relevant work if she had to take four to six excess breaks during each workday.  (R. 388).  However, if Plaintiff's limitations were only one or two excess breaks, then Plaintiff would be able to perform her past relevant work.  (R. 388). The ALJ, after properly considering the objective medical evidence, treating physician opinions, consultant assessments, and Plaintiff's own testimony and daily activities, found that Plaintiff's residual functional capacity allowed her to complete a normal workday with normal breaks, and no excess breaks.  (R. 21).

**No. 1:08CV119-MP/AK**

Accordingly, the ALJ properly applied the vocational expert's testimony to find that, given Plaintiff's residual functional capacity to perform medium work, Plaintiff is able to perform her less demanding past relevant work. Therefore, Plaintiff is not disabled.

Accordingly, it is respectfully **RECOMMENDED**:

That the decision of the Commissioner denying benefits be **AFFIRMED**.

At Gainesville, Florida, this __*9th*__ day of February, 2010.


_s/ A. KORNBLUM_____
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**



**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.

**No. 1:08CV119-MP/AK**